UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 12-md-2323 (AB)<br><br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden, on behalf of themselves and others similarly situated,<br>       Plaintiffs,<br><br>v.<br><br>National Football League and NFL Properties LLC, successor-in-interest to NFL Properties, Inc.,<br>       Defendants. | **Hon. Anita B. Brody**<br><br>**E-filed in:** 18-md-02323-AB |
| **THIS DOCUMENT RELATES TO: ALL ACTIONS** | |

### DECLARATION OF MICHAEL L. MCGLAMRY IN RESPONSE TO THE COURT'S MARCH 28, 2018 ORDER [ECF NO. 9833]

Michael L. McGlamry declares, pursuant to 28 U.S.C. § 1746, based upon his personal knowledge, the following:

(1) I am *sui juris* and a shareholder in the law firm Pope, McGlamry, P.C. ("Pope McGlamry"). This Declaration is based upon my personal knowledge and is filed in Response to the Court's March 28, 2018 Order (ECF No. 9833).

(2) Along with Co-Counsel Bruce Hagen at Hagen, Rosskopf & Earle, Pope McGlamry's involvement in what became known as the NFL Concussion Litigation dates from

1

early 2011. We filed several of the initial lawsuits against the NFL in the Northern District of Georgia, cases that eventually formed the basis for MDL-2323.

(3) I have served as a Court-appointed member of the PSC throughout MDL No. 2323. I have further served as co-chair of the Discovery Committee and as a member of the Communications/ Public Relations and Ethics Committees. Other shareholders at my firm worked on the Legal Committee and the Discovery Committee.

(4) I was also a leading proponent and founder, along with Charles Zimmerman of Zimmerman Reed, of the Ethics Committee, which was formed to address ethical and legal issues resulting from the confusion following the settlement and served as Co-Chair of the Ethics Committee. In fact, over 20% of the class counsel class fees claimed by me and applied for by Pope, McGlamry were for activities delegated and approved by Co-Lead Counsel, associated with the Ethics Committee.

(5) Although Co-Lead Counsel Seeger contends that he created the Ethics Committee, (see ECF No. 8934 at ¶ 68 & n. 19), vociferous complaints and questions from me and from others, including Ethics Committee Co-Chair Charles Zimmerman, about the glut of misinformation that unscrupulous lawyers and others seeking to profit at the expense of class members, coupled with my suggestion that we retain ethics experts to address these issues, were the impetus for the formation of the Ethics Committee in January 2014, at a meeting of counsel in New York City.

(6) The Ethics Committee retained an Ethics Professor from the University of Pittsburgh to address poaching, the formation of hedge-fund-backed predatory lenders who were providing incorrect information to the detriment of former NFL players, and other issues.

(7)     Indeed, it is the work of the Ethics Committee, and in particular, by Charles Zimmerman, Jason Luckasevic and me, that became the basis for Co-Lead Counsel Seeger's attack on poaching counsel and associated predatory lenders. To assist, we communicated with the PSC and PEC, and gathered information from counsel reflecting the number of clients "poached" and copies of termination letters, many of which were obviously form letters from the same groups of unscrupulous counsel.

(8)     The work originating from the Ethics Committee authorized and approved by Co-Lead Counsel Seeger, is what led to several physicians' removal from the lists of authorized diagnosing physicians under the NFL Settlement.

(9)     In early 2017, I pointed out in an email to Co-Lead Counsel Seeger that:

> Another twist to the poaching concept involves the recent hedge fund backed law firms that have offered to pay ($10-12k) for testing and have represented that the doctors they are sending players to have a 30-50% finding of 1.5 or better QD. If that is correct, won't that greatly inflate the settlement? And, as leadership, do we have any response/position, or should we, with the NFL?

(10)    I do not believe that litigation funding is a good idea in any form, for any client, which is why my firm and I routinely counsel against such funding. At some level, it is a bane on our profession. That said, there is an important distinction between independent litigation funding, on the one hand, and, on the other, the use of hedge fund money or other funding sources to support a law firm that provides misinformation to Settlement Class Members to recruit them, provides them litigation funding, and uses hedge fund money to send Settlement Class Members to physicians that they have coached or trained to come up with a potentially fraudulent diagnosis in an attempt to game the settlement.

(11) In regard to clients' funding requests, my firm never recommends to our clients that they should utilize litigation funding advances; rather, we routinely counsel any client that brings up litigation funding advances that they are a terrible idea, with outrageous interest rates and that litigation funding company advances should be avoided. We tell clients that they should not even consider such funding unless and until they have exhausted every other possibility, including borrowing money from family or friends, taking out a personal loan at a bank, taking an advance on a prior loan or even on a credit card, and borrowing against retirement savings. Because litigation funding loans or advances are always a terrible deal for clients, we routinely discourage all clients, including our NFL clients, from entering into them.

(12) That said, some of my firm's clients truly face exigent circumstances such as bankruptcy, the foreclosure of a home or eviction from other housing, overdue education expenses and other bills that do require payment and that they cannot fund from sources other than litigation lending advances. In such cases, where our clients are facing truly impossible financial situations, and they have exhausted all other financial resources, they sometimes, sadly, turn to litigation funding or advances.

(13) This litigation has been particularly beset by litigation funding entities. That is because the class members are easily identifiable and accessed by phone, email, etc., have greater connections with each other, and, because the settlement was announced almost five years ago, there has been plenty of time for such companies to solicit them. Add to that the intensive and inordinate publicity and media attention given to this litigation, and, at some level, it is surprising that there are not more litigation funding loans in place.

(14) Until the Court's Order of December 8, 2017, I did not interpret the "No Assignment of Claims" provision, found in Article XXX, "Miscellaneous Provisions," at page 91

of the NFL Settlement, to prohibit or void all litigation funding agreements. That would have been contrary to every other mass tort/ class settlement with which I had experience or knowledge and was contrary to my understanding of this settlement agreement. Co-Lead Counsel never informed me that such a provision prohibited or voided litigation funding agreements nor did he provide any documentation to the PSC to that effect.

(15) This provision, like other similar provisions in most other mass tort and class action cases, is typically in place to protect the defendant(s) and claims administrator from paying a claim only to have another "assigned" claim submitted thereafter. Such provisions protect the defendant and claims administrator from the threat of multiple payments for the same claim, and are typically proposed by the defendants.

(16) Acting on the premise that this assignment provision was a significant provision of the settlement agreement (in its various iterations), and that all plaintiffs, class members and their counsel and the public should have been directed to it, with its importance highlighted by leadership, I went back and reviewed emails, attachments thereto, documents, power points, court filings, settlement documents, notices, etc., to see what was said about this provision up to the final approval of the settlement agreement by this Court.

(18) As previously indicated, I served on the Communications Committee which was chaired by Co-Lead Counsel with membership selected from attorneys in the PEC and PSC. It was organized early in the litigation and worked at least through final approval by this Court. Once the settlement was initially announced in the fall of 2013, our committee worked with our PR firm, CLS Strategies, on numerous issues associated with the settlement and the settlement documents. These efforts included, but are not limited to, the following:

    (a) Media surrounding the settlement;

(b) Drafting and implementing a Media Plan which addressed op eds, webinars, speaking engagements, interviews, and much more;

(c) Drafting, reviewing and editing a NFL Settlement Road Show Deck (Power Point);

(d) Drafting, reviewing and editing a Fact Sheet: NFL Concussion Settlement;

(e) Drafting, reviewing and editing Talking Points; Revised Settlement in the NFL Concussion Litigation;

(f) Drafting, reviewing and editing an NFL Concussion Settlement: Informational Update;

(g) Drafting, reviewing and editing individual op eds and interviews for clients and experts; and

(h) Drafting, reviewing and editing a Webinar Presentation for players, media and attorneys (Power Point based).

In reviewing all of this material and the email communications among and between the committee and its members, there were no references or mention of this provision although there were many references to lien resolution, benefits under the Collective Bargaining Agreement, the ability of class members to go forward with other litigation, including worker's compensation claims, insurance benefits, and other rights, restrictions and obligations in the settlement agreement.

(19)   I also served on the Ethics Committee which was formed at a meeting of attorneys in New York City in January, 2014. This meeting included Co-Lead Counsel, PEC and PSC members and other attorneys who individually represented and had filed cases on behalf of former players. Even before that meeting, there had been considerable talk among leadership

about "poaching," where another lawyer would solicit and take a represented client/ class member by offering a lower fee percentage. I had had many such communications with Co-Lead Counsel and with Charles Zimmerman, a member of the PSC. Some of the same concerns were voiced at the meeting, and the Ethics Committee was set up on the spot. Thereafter, our committee worked on the poaching issues which initially were primarily firms taking existing clients by offering a lower fee percentage but, over time, by approximately mid-to-late 2016, evolved into poaching by what seemed to be organized groups of lawyers, some of which appeared to be backed by funding companies. Our committee worked with Co-Lead Counsel, other members of the PEC and PSC and a law school ethics professor with the focus on how to protect our clients/class members and their individual attorneys. At no time over the course of that work, the many calls, emails, etc., between the committee members and Co-Lead Counsel, was there ever a concern raised or a reference made to this agreement provision in Article XXX. In fact, the issue of the provision ostensibly prohibiting loan assignments never came up until long after the second level poachers were identified and efforts made thereafter to expose their conduct.

(20) I have also reviewed the documents on the settlement website nflconcussionsettlement.com that predated the final approval of the settlement by this Court. This includes the various forms of notice provided to class members (short form, long form, supplemental, etc.), motions for preliminary and final settlement approval, FAQs, etc., and none of these documents make referenced to this provision, although they do reference the vast majority of the other provisions, either specifically or generally.

(21) In accordance with the work of the Ethics Committee, a July 18, 2016 letter from Co-Lead Counsel Seeger, a copy of which is included as the first Attachment to this Declaration,

7

cautions Settlement Class Members against litigation funding loans, in a manner similar to my law firm's standard practice:

> Some of you may be approached by persons who see an opportunity to enrich themselves with your valuable Settlement benefits. There are persons and organizations that offer loans secured by future settlement payments. These loans typically carry excessive interest rates, sometimes over 3% a month, which allow even small "advances" to quickly snowball into substantial debt. These practices are sometimes referred to as predatory lending. We are very concerned that some of you may be the victim of these predatory lending practices. Though the promise of cash-in-hand can be tempting, especially during difficult financial times, if you are able to resist borrowing against any payments you might be eligible for under the Settlement, you should. We are hopeful that the Settlement will be open for registration before the end of the year and that claims for monetary awards for Qualifying Diagnoses can begin shortly thereafter.

(Attachment 1 at p. 2). Notably, however, Co-Lead Counsel's letter does not inform Settlement Class Members that such litigation funding loans or advances are prohibited by the Settlement Agreement, that the Settlement Agreement prevents them from obtaining such funding, or that the Settlement Agreement would void attempts to obtain such funding. Knowing that players were being solicited by funding companies, wouldn't it have been Co-Lead Counsel's duty to inform, if not instruct, class members that such loans were in violation of the Settlement Agreement? If that was Co-Lead's interpretation of the Settlement Agreement, how easy would it have been to alert the Settlement Class Members that loans were prohibited?

(22) In comparison to Article XXX in the Settlement Agreement, similar, and even stronger, anti-assignment provisions are found in the Wright Hips MDL Master Settlement Agreement,[1] the DePuy ASR Hip Settlement Agreement,[2] and the Stryker Rejuvenate Settlement

---

[1] Section 12.11.1 of the Wright Medical Conserve Settlement Agreement provides, in relevant part:

Agreement,[3] all of which were proffered by the defendants. Yet none of those provisions have been found to negate litigation funding advances.

---

> [N]either this Settlement Agreement nor any of the rights, interests, or obligations hereunder may be assigned, at any time, including but not limited to prior to the execution of this Settlement Agreement, by any EC or attorney for any EC, without the prior written consent of Wright Medical. No settlement payment pursuant to this Settlement Agreement may be assigned, at any time, by any EC or his/her attorney without the prior written consent of Wright Medical. Any assignment in violation of this Section 12.11.1 shall be null and void *ab initio*, and if such assignment is not null and void *ab initio* for any reason, payment under any Individual Settlement is precluded until such time as the assignments in violation of this Section 12.11 have been nullified and voided, and the Claims Administrator has been provided proof of such nullification.

[2] Section 22.9 of the ASR Hip Settlement Agreement provides, in relevant part:

> Neither this Agreement nor any of the rights, interests, or obligations hereunder may be assigned – at any time, including but not limited to prior to the Execution Date – by the [*sic*] any EUSC ["Eligible US Claimant"] or Counsel, without the prior written consent of DePuy. No right to receive a Settlement Award Payment pursuant to the U.S. Program may be assigned – at any time, including but not limited to prior to the Execution Date – by any EUSC, QUSC ["Qualified US Claimant"] and/or any Enrolling Counsel without the prior written consent of DePuy. Any assignment in violation of this Section 22.9 shall be null and void *ab initio*, and if such assignment is not null and void *ab initio* for any reason, payment of any Settlement Awards under the U.S. Program to such QUSCs shall be precluded until such time as assignments in violation of this Section 22.9 have been nullified and voided and the Claims Administrator has been provided proof of such nullification.

[3] Section 21.9 of the Stryker Rejuvenate Settlement provides, in relevant part:

> [N]either this Agreement nor any of the rights, interests, or obligations hereunder may be assigned – at any time, including but not limited to prior to the Execution Date – by the [*sic*] any Eligible Claimant or Counsel, without the prior written consent of HOC. No right to receive a Settlement Award Payment pursuant to the Settlement Program may be assigned – at any time, including but not limited to prior to the Execution Date – by any Eligible Claimant, Settlement Program Claimant and/or any Principle Responsible Attorney without the prior written consent of HOC. Any assignment in violation of this Section 21.9.1 shall be null and void *ab initio*, and if such assignment is not null and void *ab initio* for any reason, payment of any Settlement Payment Awards under the Settlement Program to such Settlement Program Claimants shall be precluded until such time as assignments in violation of this Section 21.9 have been nullified and voided and the Claims Administrator has been provided proof of such nullification.

(23) I personally served as Co-Lead Counsel in the Wright Hips federal MDL-2323 and California JCCP-4710 consolidations and have overseen all aspects of the settlement administration and payments made in the three separate global settlements negotiated by me in that litigation. I further served as part of Plaintiffs' Leadership in the Stryker Rejuvenate consolidation. It is my understanding that Mr. Seeger served on the Plaintiffs' Executive Committee in the DePuy litigation.

(24) It is my understanding that such anti-assignment language, usually requested by the defendant, was taken from other similar settlements of mass tort and class action cases, including the settlements of the Vioxx, Volkswagen, Zyprexa, and Actos settlements (wherein Mr. Seeger served as co-lead counsel, principal or chief negotiator, or Plaintiffs' leadership, per his firm website). To the best of my knowledge, none of these anti-assignment provisions has been used to void a litigation funding agreement, despite that qualified claimants in these settlements, including a few clients of my firm, entered into similar funding agreements against the advice of counsel. I am not aware of any settlement award being withheld or delayed by the claims administrator in any of these settlement programs or any award of common-benefit attorneys' fees being withheld or delayed by the claims administrator due to funding advances or assignments of rights to payment by claimants. In fact, in such actions, as here, typically claimants provided their loan information to the claims administrator to memorialize the creation of such a contract. Then, once payment is made from the defendant and claims administrator, counsel for the claimant/plaintiff pays the loan and obtains a release for the claimant.

(25) In answer to the Court's specific questions, I provide the following answers:

1. My firm or any attorney associated with my law firm:


    A.    Previously represented **94** Settlement Class Members that we do not currently represent (Notices of lien have been filed as to most of these former clients);

    B.    Currently represents **403** Settlement Class Members.

2. To the best of my knowledge, the following number of Settlement Class Members previously or currently represented by my law firm or any attorney associated with my law firm:

    A.    Have received a Monetary Award: **8**;

    B.    Have been informed that they are entitled to receive a Monetary Award: **11** (including the 8 identified in 2A);

    C.    Have applied for a Monetary Award: **33**;

    D.    Other than the 11 current and former clients represented by my firm who have been informed that they are entitled to receive a Monetary Award, the eligibility of my firm's remaining current and former clients has not yet been determined, and the answer to this question is unknown, given the uncertainties of the claims administration and the NFL's appeals. That said, all claims for a Monetary Award have been and will continue to be filed with the good faith basis that the Claimant is entitled to a Monetary Award.

3. To the best of my knowledge, **10** Settlement Class Members currently represented by my law firm or any attorney associated with my law firm have entered into agreements to assign their rights to a Monetary Award, entered into an agreement with any of the third-party litigation funders listed on pages 3-4 of the Court's March 28, 2018 Order (ECF No. 9833), or agreements that are similar to the

agreements attached to the Court's Explanation and Order relating to the Third Party Funder Litigation (ECF No. 9531). Of these, **1** Settlement Class Member obtained funding while represented by previous counsel. To the best of my knowledge, **3** Settlement Class Members formerly represented by my law firm or any attorney associated with my law firm have entered into agreements to assign their rights to a Monetary Award, entered into an agreement with any of the third-party litigation funders listed on pages 3-4 of the Court's March 28, 2018 Order (ECF No. 9833), or agreements that are similar to the agreements attached to the Court's Explanation and Order relating to the Third Party Funder Litigation (ECF No. 9531).

4. Of the total number of Settlement Class Members included in my answers to question #2, I am aware of **3** Settlement Class Members that have also entered into the "Assignments" referenced in question #3.

5. For the 10 current Settlement Class Member clients that have entered into "Assignments" to third-party funders, we are obligated in accordance with the terms of said agreements.

6. My firm and any attorney associated with my firm strongly discouraged our clients from seeking any litigation funding whatsoever, and thus we have not solicited, created, promoted or endorsed the "Assignments" referred to in question #3 and/or the obligations referenced in question #5. Indeed, our records reflect that at least double the number of Settlement Class Members approached us regarding litigation funding, but more than half never followed through to obtain such funding. To the extent "facilitating" is limited to signing the agreement

forms so that the client could receive funds he or she contracted for, and if we were unsuccessful in dissuading a client from obtaining such litigation funding, we would reluctantly sign acknowledgements of our clients' obligations.

7. No one at my law firm, including me, no one associated with my law firm, and no entity related to my law firm, has any direct or indirect, professional or personal association with, or serves in any capacity as an Officer, Director, or investor in any of the third-party litigation funders used by Settlement Class Members previously or currently represented by me, my law firm or any attorney associated with my law firm. No one at my law firm, including me, no one associated with my law firm, and no entity related to my law firm, has ever had any direct, indirect, professional or personal association with, or served in any capacity as an Officer, Director, or investor in any third-party litigation funder, case funder or litigation loan company. In fact, 12 different funding companies were utilized by our clients or former clients, only four of which were listed by the Court in question #3.

8. None of the "Assignments" referenced in question #3 have been resolved in accordance with the rescission process provided for in ECF No. 9517.

Redacted copies of the documents requested by the Court are attached to this Declaration.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 1, 2018, in Atlanta, Georgia.

_____
Michael L. McGlamry

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing Declaration of Michael L. McGlamry was served electronically via the Court's electronic filing system on this date, upon all counsel of record.

Date:  May 1, 2018

<div style="text-align:right">

*/s/Michael L. McGlamry*
Michael L. McGlamry
POPE McGLAMRY, P.C.

</div>